INC. We will be taking a brief recess after the first case. So, Mr. Briceblatt, you have ten minutes. You have reserved three minutes for rebuttal, I believe. Yes, Your Honor. Thank you. You may proceed. Good morning. Robert Briceblatt on behalf of Apotex Inc. and Apotex Corp. And with me is Mr. Steven Benson. We're from the firm of Kat Muchen. In this particular case, even though there are five patents, they really break down to, we'll call it two groups of patents. The related patents, all of which cover the combination, as we said, that would have been obvious of bromodidine, tartrate, and refreshed tears. The judge made legal error when he found it would not have been obvious to combine the two. To put it in perspective, refreshed tears was an artificial tears product. It had just come out. It was being prescribed for people with dry eye, which is one of the symptoms of a glucoma. And it had among its ingredients CMC as well as stabilized chlorine dioxide. And those are the two ingredients that if you look at every claim in the related patents, either one or the other were both appalled for, along with bromodidine tartrate. The judge, in finding it was not- If we could go back just a second, Mr. Briceblatt, just as a practical matter here, we're talking about two groups of patents, the O78 and the related patents. Does it result in any different consequence for your client if we should, for example, invalidate the O78 but uphold the related patents? Practically speaking, no, because it's all five of them that keeps Apotex off the market. Okay. In other words, if we were to affirm on the related patents, we wouldn't necessarily reach particular issues on the 78? Well, you should still reach the O78 question because that's out there for the public. If it's an invalid patent, it should be held invalid by this court. Just as if the court finds that the related patents are invalid because it would have been obvious to make this combination of refreshed tiers and bromodidine tartrate, but the O78 in this court's opinion is not obvious, you should still find on the four related patents. In other words, the public out there is entitled to know if any of these patents are invalid or valid. And presumably, Allen cares even if you don't. Correct. Okay, correct. But as Judge Bryson's question suggests, I think you've got a strong case with respect to the O78, but a less strong case with respect to the other patents. I hope that you're going to focus particularly on the other patents. And I will do that. I think the related patents are as well a strong case because in this particular case, one of the errors the judge made was looking at the commercial embodiment of bromodidine tartrate that one skill in the art would have known about. But what he neglects is a very important article that's entitled Bromodidine Tartrate, a One-Month Dose Response Study, which is at A25669. I say that that's important. Is that a small reference? No, actually that's the Derrick reference. Derrick actually does a dose response study using three different amounts of bromodidine tartrate. He uses a 0.08, a 0.2, and a 0.5. We all know that the 0.2 becomes or is the commercial embodiment of Alfagan, which is a 0.2 preserved by BAC. The reason why this is so significant is the two motivations for making the change from the 0.2 using BAC to a different combination with bromodidine tartrate, because we all agree that bromodidine tartrate is a very good glaucoma treatment, is that people were having two issues. Just on the reference you cite, I'm looking back at the district court's opinion. Did he specifically deal with that reference? Not in any great detail. He just kept on coming back to the 0.2 bromodidine tartrate as being what was being sold commercially. He took everything from the solubility of bromodidine tartrate. He always looked at it at the 0.2, as opposed to what was publicly known, that at below 0.2 bromodidine tartrate was in fact soluble at pH of 7. He ignored that entirely, even though that's in the record at A129903. He just ignored all of that, focusing solely on the Alfagan 0.2. Was that before the Patent Office? The one-dose response study? No. Neither that nor refreshed tears was in front of the Patent Office. Neither of those two critically important items were in front of the Patent Office. And what's so significant... What strikes me is that there are certain findings that were made by the district court that might be questioned, right? But that it may be a little difficult to say that as a matter of law, on this record, these other patents other than the 078 are invalid. In other words, the middle ground here might be to say, we've got to send this back to have the district court consider this issue under correct findings. That would be something this court could do on the related patents, though we think it's pretty clear from the record that if one just looks at refreshed tears containing both undisputed CMC and stabilized chlorine dioxide and looks at the bromonidine tartrate one-month dose response study on A25669, you would find that in this study they found the 0.08 to be therapeutically effective, which is what's called for in all these claims. And one skill in the art knew, and it was undisputed at trial, that one way you got rid of the allergy issue from using the 0.2 bromonidine tartrate would simply be reduce the dose. Well, that may be in terms of the solubility issue. The solubility issue is the oxidation issue. The oxidation issue is a bit of a problem because someone perhaps could conclude that because of the likelihood of oxidation here, that that would lead someone to think that there wasn't a reasonable probability of success or a reasonable possibility of success. Well, I would take that on two issues. One is we could go to the Thompson article, the A27312 article, that talked about bromonidine tartrate being oxidatively stable. That would be one way to go. The other way to simply say is if we're going to really do an obviousness analysis and you can buy a bottle of refreshed tears for under $100, isn't it common sense that would tell you that one skill in the art would invest $100 to take some bromonidine tartrate powder and simply add it to refreshed tears to see if there was an oxidative issue? Well, it should be so, but part of the problem with this record is that we don't know how easy or cheap it would be to try that. Well, the fact that refreshed tears was available over the counter  Well, that's certainly true, but in terms of the combination of the purite with the bromonidine, we don't know whether that was an easy thing to try or an expensive thing to try. The record just doesn't disclose that. Well, it does have the record of the Allergan lab technician, who's not even an inventor on this patent, and that's all he did. He just took some bromonidine tartrate and he put it in refreshed tears. That's not even using hindsight. That's what we say one skill in the art would do. Well, I thought it took him quite a while to do that. No, what took quite a while, or what Allergan has asserted took quite a while, was they went through a number of other combinations, but once they said, let's try refreshed tears, which is now out on the market, FDA approved, let's try that, it's one lab page. He just took some bromonidine tartrate and he put it in the excipients of refreshed tears, and you know something? There was no oxidation, no solubility issues, and that's what one skill in the art would have done. I see I've only got a minute left for rebuttal. Unless the court has some more questions, I'd like to save that time for rebuttal. Thank you, Mr. Vice President. Mr. Wagner. Good morning. My name is Wagner. We have an entirely separate appeal. And the basic bottom line here is that the pH of the claimed invention is about 7.0 or higher. Our compounding instructions, unequivocally, we take a pH in the range of 6.5 to 6.7, we've photocopied the compounding instructions in our yellow brief. Should we treat the application of the FDA as having been amended? No.  Because it has not been amended. You will see, that's a very good point, Your Honor. The Excella release pH letter never amended the compounding instructions. So even if you wanted to consider it an amended document, the compounding instruction was never amended. The letter that raises this issue was a request for a teleconference, which was denied. It says, at 1451, the FDA expressly recognized there was no amendment made. Quote, you have not submitted any new information, unquote. That's at 1451. So the original compounding instruction remains. That is the holy grail of the ANDA. That is the question of infringement. And to show there's never been a holding of this court that has deviated from the requirement that if the ANDA is explicit on a point, that we must focus our entire inquiry on that unequivocal statement. And to show you the weakness of the appellee's case, at page 26 of their red brief, the last five lines, they take a nice, lovely quote, a nice sight bite out of Abbott Labs. Of course, there may well be genuine disputes as to whether the ANDA specification defines the compound with sufficient particularity and so on. What they omit is the statement, first the holding was against them in Abbott v. Torfarm. And the general statement of the law is that if an ANDA specification defines a property of a compound such that it must meet a limitation of an asserted claim, then there will almost never be a genuine dispute of material fact that the claim is infringed with respect to the limitation. That's at page 1373 of the federal- So is it your view that it matters that it's an outcome determinative difference whether or not we conclude that there was an amendment or not? Or is it your view that even if there were, and even if we were left in the 6.5, 6.7 range- There are ways that you could rule in our favor, but I think that's in our brief. But for the point of my argument, this point is so crystal clear that I'm focusing only on this point. I would have thought you would have said that the Bayer case was crystal clear even if there was an amendment. Well, I think that's a good point, Your Honor. So I think you understand the issues. We have very little time. I'd like to reserve the rest of my time for rebuttal. Could I ask- Yes, of course, Your Honor. The other side comes back. It seems that one of your arguments for your position is that there were alternative ways to do this- Yes. In terms of buffers and- Yes, indeed. And the other side's response to that is the cross-examination of Dr. Mitra. Yes. He recognizes that you couldn't do these alternative buffer things because that was outside of the ANDA. Do you dispute that? No, it is outside the ANDA, and that's exactly why we should win the case, Your Honor. Because they point out in their red brief that we can't rely on that because it's outside the ANDA. And that's precisely why they lose this case, because our ANDA is explicitly clear that the compounding instructions have this pH of 6.5 to 6.7. If you look most easily in our yellow brief, you'll see photocopied, the ANDA instructions to the operator maintain the pH of 6.5 to 6.7. That's the highest pH you can have, the starting pH. After that, there may be drift. So that's why we win the case. Exactly the point. Apelli makes the point for us. Thank you, Your Honors. Thank you. We're next from Allegan, Mr. Singer, with respect to both appeals. May it please the Court, Jonathan Singer for Plaintiff Apelli Allegan. I'll start with the apotex issues and address the arguments of counsel on the apotex issues. I have some problems with some of the findings that the district court made here. And help me understand whether they're supported by the record. For example, the district court said the structural features of brunonidine make it particularly susceptible to observation. I find no such testimony. Where's the testimony that supports that finding? In the record testified to by Dr. Stella at A8021, A8023. Hang on one second. Dr. Stella testified that the additional amine groups on brunonidine made it susceptible to oxidation. They weren't particularly susceptible. I don't see where he said particularly susceptible, which is an important difference. Well, it is. If in the context of... Did he say particularly susceptible? He said actually it made it more susceptible to oxidation than the prior compounds that they were looking at. Where did he say that? Let's see. D. All right. I apologize for not having that site right handy. Okay. All right. Dr. Stella testified at A7915 about the oxidation potential of brunonidine in relation to the Thompson reference. I'm sorry. What was the... A7915 to A7916 that the Thompson reference talked about a bioactivation oxidation mechanism that was not applicable to the length of time. Yeah, that's a different point. Where does he say that brunonidine is particularly susceptible to oxidation? I read this testimony. Yeah. As you say, it's an important point. I actually remember, Your Honor, the testimony talking about the amine groups that made it... Two extra amine groups that made it susceptible to oxidation, and I apologize for not having that particular page site right at the ready. Well, he talks about the structure 7918, but he doesn't say that that makes it particularly susceptible. That is his testimony. That is the extent of his testimony. He doesn't say particularly susceptible, does he? He says that the elements in the structure... Let me read it. There are elements in the structure, nitrogen in the ring structure. We will get to that structure that... Where are you reading from? I'm sorry. I'm reading it A7918. All right. And the question is, what does that mean when one describes a component or an excipient as a strong oxidizer? And that's the puree. And it basically says it's capable of oxidizing drugs, any chemical. In fact, if you look at the structure of brunonidine, again, you can get into some details here, and I don't think I want to bore the court with it. But there are elements in the structure. For example, there are nitrogens in a ring structure. We will get to the structure in a few minutes, and I can go back and explain that. So he does not say it's particularly susceptible to oxidation. He does not say particularly susceptible, Your Honor. So it strikes me that that's a finding which isn't supported by the record. Let me tell you, I've got another problem here where, in discussing the small reference, he seems not to understand the pH partition principle. He seems to say, well, there's been no showing that 0.2 would be soluble at higher pHs. But he doesn't suggest that you could have a lower concentration that was soluble at higher levels which would be equally effective, which was what the argument was. He just doesn't address it, right? I think the pH partition theory was not— He does not mention that in his opinion, right? He does not. And the pH partition theory at trial, it was not—the inventors were not claiming, of course, that they invented the pH partition theory, as that, of course, has been around for a long time. And the issue with the—in terms of the small reference was that the pKa of the small reference was substantially higher than the bromidine. So in terms of it, I think it was 9.4. It was one and a half units higher, such that raising the pH of the small compound would not lead to solubility issues. So the prior use of the small compound had been at the lower zone. The theory here was that you could reduce the concentration of the bromidine below 0.2 and use a higher pH, and you'd get the same effectiveness, right? That was the theory of the inventors. He doesn't address that at all. Well, I disagree. I believe he does address the ability to use a lower concentration in the alkaline ranges and the solubility issues that resulted from that. In addition—and that was the—in essence, if you will— He says—this is on page 21 of the opinion paragraph 61. It says the small reference does not in any way suggest that it was possible to raise the pH of the bromidine formulation above the 6.2 to 6.5 pH range at which bromidine was known to be soluble in the formulation. That seems to be addressing that it wasn't possible to raise the pH for the 0.2 concentration. He doesn't address the question of whether you could lower the concentration, make it soluble at the higher pHs, and still get the same effectiveness. He doesn't address it. In fairness, I believe he addresses it in the context of the solubility concerns that were demonstrated with the product in the instance of both what the inventors actually did when they were making the formulation, and as well as demonstrated in the patents with the rapidly descending graph of solubility that is in the patents that the solubility is going down. And remember the prior formulation of AlphaGant, which was a 0.2 product, was down at the 6.4 range. And it was testified at trial that the reason that was done was because of solubility concerns. Formulators don't look at a single point in formulating. They need what's called a robust formulation. And to get that robust formulation with 0.2, the pH was already down, was pushed way down to 6.4 to make sure that the product stayed in solution. Yeah, but we're talking about reducing the concentration below 0.2. He does not address that question, right? He addresses it in the context of the solubility issues with permonanate in the alkaline area. Where does he address it? I didn't see. I read the opinion. Maybe I'm wrong. I didn't see that he addressed that. He didn't seem to be aware of this pH partition principle. Well, I think in talking about the—certainly there was extensive testimony at trial about the pH partition theory. And in terms of the small reference, what that reference is disclosing in and of itself is an application of the pH partition theory. And so the simple having read the reference and putting it in the opinion, that's what the reference is talking about. The notion that one can raise pH and perhaps generate improvements in bioavailability from in vitro to in vivo. And so I think the court's discussion of the small reference shows an understanding of that principle and the issues with the solubility in terms of combining the refreshed tiers plus permonadine that were demonstrated at the alkaline pH ranges. Was there testimony that you couldn't use a lower concentration of permonadine at the higher pH? In terms of—there was testimony that there was concern that that would be therapeutically effective or not, and that's the Derrick reference that was raised by counsel. That reference actually establishes that the lower concentration, the 0.08 concentration, was not therapeutically effective. It's at the regular pH of 6.4. Fair enough. Fair enough, Your Honor. But the issue with the higher pH and the lower concentrations is one of solubility and the expectation of one of skill in the art as to whether or not this would be functioning. So let me state again, is there testimony that the pH partition principle wouldn't allow you to have solubility of an effective amount at a higher pH? I don't believe that was addressed because the pH partition theory doesn't address solubility. So the answer to your question would be no, as I understand your question. There was certainly testimony that at the alkaline pH ranges, the permonadine would have solubility problems. And in fact, that's why the prior formulation was found at the 6.4. But the pH partition theory with respect to solubility, no, that doesn't prevent solubility. That's just, as you pointed out, a theory of bioavailability with higher pH and the unionized species of the drug. So I think I hope I've answered your question. Just quickly to address the Derrick article that was relied on by counsel as saying that it was therapeutically effective, what actually was shown in that article was at the end of the treatments, a one-month study, as counsel said, the IOP lowering for that lower concentration was scarcely better than the vehicle of the product. So they had vehicle, 0.08, 0.2, and 0.5. And the Derrick article recommended the 0.2 product for going forward. And everything lowers IOP a little bit. There's a placebo effect. And the vehicle itself lowered IOP. And the 0.08 product at the end of the 28-day study on the key measure of IOP effectiveness does this lower IOP by 20% or more. There were only seven patients that lowered IOP on the 0.08, and there were five on the vehicle. So the testimony at trial was that this was scarcely better than the vehicle. It did not suggest to the person of ordinary skill that a lower concentration than 0.2 would be effective. Also to address, I'll ask, because you said you had some strong case on the 0.78 patent. I can address that if there are questions. Then I would turn to the one other point on the. . . If you look at the Radcliffe patent, it talks about stabilized chlorine dioxide. The Radcliffe patent talks about stabilized chlorine dioxide, but the. . . All the quotes you picked up sort of excluded that part of the Radcliffe patent. I'm sorry? The quotes that you used excluded that language from the Radcliffe patent. I disagree, and respectfully so. I believe the Radcliffe patent talks about the active species being chlorine dioxide. And that's the confusion at times in the prior art between chlorine dioxide and stabilized chlorine dioxide. And that to me is the key point on that patent, is that the inventors discovered and patented the use of the stabilized chlorine dioxide as the source preservative. That the pH ranges in their claims require it to be the stabilized chlorine dioxide versus the active chlorine dioxide species. And if you look at Radcliffe, all the things he's talking about are in fact the chlorine dioxide gas, because that was what was known. But there are multiple references in Radcliffe to stabilized chlorine dioxide. As a starting material, I agree, Your Honor. No, there aren't. Okay, so I wanted to make that point, that in terms of the Radcliffe, that's the distinction between the two references. In particular, I think your opposing counsel calls out column 11, the chart of components between lines 50 and 58 of column 11 of Stockholm. Why is that not sufficient to cover the additional components of the claimed formulation? The use in Stockholm of the stabilized chlorine dioxide was as a potentiating agent and not as a preservative species. It was used, ironically, as an oxidizer. We talked about oxidation. To oxidize the actual polyquat, the quaternary ammonium that was the preservative species. To potentiate the effect and make that species work better. The claimed invention uses the stabilized chlorine dioxide as the sole preservative. As the actual, if you will, killing entity. The thing that is killing the bugs. And that is a prime difference. That's the major difference, frankly. Between the 07A patent and all the prior. Is the use of the stabilized chlorine dioxide itself as the active killing species in the invention. I don't understand the starting material there. They talk about using stabilized chlorine dioxide as a preservative. Where is this distinction between starting material and active material? Where is that? It's in the prior art and it's in the past. It's in Ratcliffe? Yes, it is. Ratcliffe talks about using the stabilized chlorine dioxide to generate chlorine dioxide. If you look at... Isn't that the way it would always work? No, that respectfully is not the way it will always work. And that is the invention of the 07A patent. Is that prior to the 07A patent, stabilized chlorine dioxide was used to generate chlorine dioxide. As an acidification of the species. You know, the term chloride, stabilized chlorine dioxide, chlorine dioxide, thrown around. And sometimes I think in inconsistent matters. I think in all of this. When you say stabilized chlorine dioxide. When you refer to SCD for purposes of the references we're talking about now. Are you talking about ClO2 negative ion? That's what stabilized chlorine dioxide is, yes. As you're defining it. As I'm defining it, I'm sorry. And all of the references that we've been talking about that is to say Ratcliffe is using it in that form. Your argument is, it's the ion that is killing it. It's not conversion into chlorine dioxide and then chlorine dioxide that's the killing agent. That is the prior argument. Your argument is that that's why you have the inventive step. Or at least a significant component of your inventive step here. Is the use of the ion as the killing agent. Without the need to convert it to the actual ClO2. You have stated it as well as I could or better. Well that's what I understood. But I have to say that it's a little unclear in the various references as to when we're talking about what. And the reason fundamentally is. And I'll turn to the Acela issues in a moment. The reason fundamentally is because this was testified to be a marketing work. So you have chlorine dioxide gas. And then you have something called stabilized chlorine dioxide. Which is not stabilized chlorine dioxide at all. It's a different chemical entity that can be converted to chlorine dioxide. And so there is. First to admit there's a lot of confusion in the prior art about which terminology to use. With respect to the Acela issue. Someone pointed out. Yoram you pointed out the Beyer case is the most difficult case for us. But I believe we are within the Beyer case. Because the Beyer case talks about if the ANDA specification settles the issue. Then there can be no genuine dispute of material fact. But here the ANDA specification does not settle the issue. That was the issue. What is the ANDA specification? And we had a situation where Acela went to the FDA. And started with the specification at 5.5 to 6.7. And it was the low end of the pH range. Which was admitted at trial to be the key number was 5.5. And then as they went through the FDA process. The FDA said that's pH is too low. That is not going to be biocoolant. And they wrote to the FDA and said no, no, no. We want to correct the record. The low end of our pH range is not 5.5. It is 6.5. And that statement to the FDA called into question. Frankly contradicts the original and the specification. But even if we assume that this was effective to amend the application. So the lower end is 6.5. I have difficulty in seeing why under the Beyer case. One should assume that they won't comply with the ANDA group. I mean don't we have to assume that they're going to comply with it. If they don't comply with it, they've violated the FDA regulations. Two things. One, I think the testimony at trial would be that it would be essentially required. That they have a pH higher than 6.7 to meet that low end of 6.5. All the products at issue drift a half a unit. But in respect to the ANDA specification that you're talking about. No, no, I'm not sure that that's what the testimony said.  Not that it was a half a unit or more. Fair enough. It could be more than half a unit. But I said up to, didn't I? I disagree. I believe it was in many instances over half a unit. In many instances. But I don't see that there was testimony that it had to be half a unit or more in all instances. I think that's fair. The judge found, Judge Sleet found that I think under the standard of proof. That it was going to be in all likelihood a half unit of pH drift. All the products that were before the court had that drift. But I'm having a hard time, I think, just parroting Judge Dyke for a moment. Bayer seems to say, I mean suggests that there may be factual issues about whether or not they comply with the specification. But essentially we don't care. Because they're stuck with the end. And here, notwithstanding whether or not we're talking about 5.5 or 6.5 is the low end. The high end is never changed. It's absolutely clear, correct, that under the ANDA, they're stuck with a higher level of 6.7, right? I think that's the question. That's what the ANDA says. There's no dispute, there's no equivocation. The high end is 6.7, correct? I disagree, respectfully so. The high end is 6.7. Well, what is the end? Show me what in the ANDA suggests or states that it's not 6.7. The original ANDA, Your Honor, does say that the high end is 6.7. Has that ever been modified? That has not, to my knowledge, been modified. Okay, so there's no dispute that that's what the ANDA says is the high end. That's right. And that's what I'm having a hard time with Bayer. Because they clearly account for the fact that we can fight about whether or not they can ever meet that. But we don't care about that, right? Am I misreading the case? I think that's what the Bayer case says. But in fairness to the record here and in fairness to what the facts of the Bayer case were, the Bayer case didn't have a change, didn't have someone go to it. But you've just told me that the change, whatever the change or non-change was, it had to do with the lower level of 5.5 versus 6.5. There's no dispute, is there, that the higher level in all respects was, is, and will be 6.7 under the ANDA. Am I right about that? I believe there's no dispute that it was 6.7. There is a dispute that it is 6.7 as of the record after the ANDA was filed. I don't understand what you're saying. The ANDA wasn't changed. It was the top of 6.7. Your theory was that they couldn't achieve that. And our theory, well, the proof at trial was that with a lower end of 6.5, that's correct, they cannot achieve a upper end of 6.7. It's essentially impossible to achieve that. And as I've said— But then they violate the ANDA. And so they've got a problem with the FDA, right? They have a problem with the FDA, but also we have to— And they're not protected for an unrefrigerated case volume. That's true. But it's our job in or under the authorities, it's our job to see what is most likely to be sold under the auspices of the ANDA. And by changing the lower end to 6.5, they've made it impossible to— Well, it's not sold under the auspices of the ANDA if the limit there is 6.7. Any product that doesn't comply with that is not sold under its auspices. It only covers and protects a certain level, and there's no dispute, as I think you've acknowledged, that that higher end is 6.7. Am I wrong about that? You are not wrong about what the original filing force of the ANDA says. Well, the original—every filing, no filing, there's been modifications, arguably, or a dispute or discussion over the low end. There's been no dispute and no discussion over changing the 6.7 as it appears in the ANDA, right? Well, that's—Your Honor, in fairness— Has there been any dispute in terms of changing that number? Have they ever suggested we're going to have to up that number or change that number? The dispute is all in the lower level, not on the upper level, correct? I want to be careful how I say this because what they went to the FDA and said was that the FDA was mistaken and the release specification was 6.5 to 6.7—excuse me, the label specification was 6.5 to 6.7. It doesn't actually say that we are sticking with our manufacturing or our old data that you have, which demonstrates a much broader range. So all we have is them saying that they needed to correct the record, that the prior pH ranges that they provided to the FDA were erroneous. But there was no suggestion that they needed to correct the record, that the record was erroneous with respect to the 6.7 graph. It was only with respect—excuse me—to the lower range. They did not say they needed to correct the upper range. That is correct. I agree with that. As I said, I repeat myself as to my position. I'm happy to answer any other questions. I thought I understood the respective positions, and now I'm not so sure. So I thought—this may oversimplify everything—but I thought your position with respect to the 6.7 was that, sure, they can say 6.7 when it comes out of the factory, but it's not going to stay at 6.7. It's going to be at 7.2 or some such over time, and that is a problem. So that they can put 6.7 in there and done, and that isn't the product that is going to be sold and used because of the pH creep. With all due respect, the pH creep is down, Your Honor. Oh, I'm sorry. The issue is the opposite, and that's what— You're absolutely right. I flipped the— Yeah, and it's a very— Now I'm— And Judge, to be fair, Judge Sleet had the exact same question at a sidebar, and we did not include it in the appendix. It was in the record because it came up on reply that the critical number was the upper number. The upper number covers the manufacturing process, which is where you say the infringement would take place. The upper number in the original file covers the manufacturing process. I agree with that. But Judge Sleet had the exact same question, and he asked, maybe I have misperceived—this is at—and I can provide the transcript page. It's page 1112. It's Excella JA215. Maybe I have misperceived Dr. Stella's opinion. It seems to be what Dr. Stella is saying is in order to get to 6.7, you've got to be at 7 or above. And then our—my colleague, Ms. Brooks, it is the reverse, Your Honor. He is saying in order never to drop below 6.5, you're going to have to manufacture at above 6.7. And then Excella's counsel in response says it is the bottom end of the stability range that is critical. So the parties were arguing over the same thing at the district court, and now we come here and they say, oh, no, it's the top end that is critical in the reply brief. So that's where we were in the district court. But we've come to a different place on appeal, and I understand the questions of the court. And Ms.—Excella's counsel went on. It is the bottom end of the stability range. If it is 5.5, Dr. Stella's opinion does not apply. If the end had been changed at some point to 6.5 to 6.7, which was the fight for the stability range, then his opinion would apply. So what we have is, we thought, an admission that the bottom range was what was important because of the concept of pH drift, even in the face, Your Honor, of an original and a specification that says that the top end is going to be 6.7. So I think it fits into the Beyer case for that reason. Thank you. Thank you. Mr. Brady, we'll give you a couple of extra minutes if you need it. Thank you, Your Honor. First of all, I'd like to just touch on Radcliffe briefly. The position Allegan is now taking seems to be different than the position they took in the board of patent appeals. There, they made it quite clear when they stated at A27774, the fact that stabilized chlorine dioxide is a well-known preservative for other applications may make it useful to try to adapt this preservative material to ocular applications. And both the Radcliffe and the 078 patent both refer to Puragine as a stabilized chlorine dioxide product. So we think that it was pretty obvious to just add the tonicity and buffers, and that would really invalidate the 078 patent. Moving on to the arguments involving the dosage or the amount of bromonidine tartrate, again, what was said in the Derrick study is, and this is on A25669, all concentrations of bromonidine significantly reduced IOP compared to baseline and placebo at all follow-up visits. So it was all concentrations, including the 0.08, the 0.2, and the 0.5. Not as good as placebo. They were all significantly better, and they improved it. Also, the Burke reference that we cite in our brief shows bromonidine tartrate being used at 0.1 as an effective up-bombing. It's right there in the specifications and the examples. So we, and the oxidation, it's the same thing. Again, it was speculation by Professor Stella, who I think we all agree was one far more skilled in the art than the average practitioner. The average practitioner would have read the Thompson article and realized that bromonidine tartrate was oxidatively stable, and for the small price of a bottle of refreshed tears at their local drugstore, it would have been worth trying. Unless the Court has any other questions, I think our briefs handle it. I think my initial argument in this rebuttal handled it. Thank you. Thank you, Mr. Bryce Blatt. Mr. Wigner, do you have anything to add? Your Honor, we waive argument. Thank you. Very well, the case is submitted. We will take a 15-minute recess.